## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**VICTORIA DOBSON,**                        Case No. 1:19 CV 1424

    Plaintiff,

    v.                                          Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                              MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Victoria Dobson ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 16). For the reasons stated below, the Court reverses and remands the decision of the Commissioner for further proceedings.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in August 2016, alleging a disability onset date of December 7, 2015. (Tr. 211-19). Her claims were denied initially and upon reconsideration. (Tr. 147-52, 162-73). Plaintiff (represented by counsel) and a vocational expert ("VE") testified at a hearing before an administrative law judge ("ALJ") on March 16, 2018. (Tr. 29-68). On July 17, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 13-23). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner.

(Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on June 20, 2019. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background & Testimony

Born in 1962, Plaintiff was 53 years old on her alleged onset date. *See* Tr. 211. She had previous work as a child care provider, telemarketer, food service worker, and packer. (Tr. 39-42, 246-52). At the time of the hearing, Plaintiff lived with her daughter and teenage grandchildren. (Tr. 37). She drove about once or twice per week to visit her brother in a nursing home, or go to the store (though her daughter usually went to the store). (Tr. 38-39, 51).

Plaintiff believed she was unable to work because her back "would just give out" (Tr. 42) and she could barely hold anything in her left hand (Tr. 43) ("It slips right out. I have no strength hardly."). Plaintiff had surgery on her left hand in January 2016, but continued to have pain and muscle spasms; she wore a brace. (Tr. 43-44). Plaintiff also had problems with her right hand, which she treated with pain medication. (Tr. 44). Surgery was also recommended on her right hand, but Plaintiff declined. (Tr. 43). Plaintiff described deteriorating bones at the base of her thumbs; this made it difficult for her to perform tasks like opening jars or packages or zipping jackets. (Tr. 54-55). She could write and brush her hair, but not more than twenty minutes without pain. (Tr. 55).

Plaintiff also described constant pain in her lower back and knees, with muscle spasms in her thighs, legs, and back. (Tr. 44-45). She rated the pain as about seven out of ten with medication, eight or nine without. (Tr. 45). The pain worsened over time to the point where Plaintiff had difficulty going down stairs. *Id.* Her pain was aggravated by sitting upright or walking and alleviated by laying on her side. (Tr. 49-50). Plaintiff also had swelling in her knee; a cortisone

2

injection did not work. (Tr. 53-54). Plaintiff testified that chiropractic treatment, injections, and physical therapy did not help. (Tr. 48-49).

Plaintiff estimated she could sit for one or two hours without moving, stand still for fifteen minutes, and walk for "[n]ot longer than an hour". (Tr. 45-46). She was unable to lift more than five pounds because of her hands; she could not open things. (Tr. 46).

Plaintiff could start chores and work for about fifteen minutes, but her grandchildren completed most chores. (Tr. 46-47). On a typical day, Plaintiff showered and got dressed, took the dog outside, washed some dishes, took food out for dinner, and cooked dinner; she had to lie down and rest after each task. (Tr. 50-51).

<u>Relevant Medical Evidence</u>

*Prior to Alleged Onset Date*

In March 2015, Plaintiff saw Gaby Koury, M.D., for left wrist pain. (Tr. 531). A previous EMG was negative for carpal tunnel. *See id.* Dr. Koury diagnosed tendinitis, gave a Toradol injection, and recommended therapy and a splint. (Tr. 532). Plaintiff followed up with orthopedist Kevin Malone, M.D. (Tr. 528-29). Plaintiff reported pain at the base of her left thumb, worse with pinching and grasping; she quit her daycare job the previous week due to pain. (Tr. 528). Dr. Malone diagnosed pantrapezial arthritis left thumb and a volar ganglion cyst (Tr. 529); he provided a splint and an injection, and noted he would "attempt conservative treatment including injection, splint, NSAIDs, [and] activity modifications." (Tr. 530).

In December 2015, Plaintiff saw Sharon Foster-Geeter, CNP, for low back and wrist pain, but was "feeling well" otherwise. (Tr. 524). On examination, Plaintiff had a normal gait and intact coordination. (Tr. 525). Ms. Foster-Geeter noted no spasms or swelling in Plaintiff's spine, a cyst on her left wrist, trace edema in her right knee, and full range of motion. (Tr. 526). She diagnosed,

*inter alia*, left hand pain (tendinitis), and midline low back pain without sciatica; she prescribed Flexeril, and referred Plaintiff to physical medicine and rehabilitation ("PM&R") for her back and to orthopedics for her hand. *Id.* Contemporaneous lumbar x-rays showed grade 1 anterolisthesis of L4 upon L5, prominent degenerative disc disease at L5-S1 with loss of normal disc space height, hypertrophic spurring involving the posterior facet joints of L4-L5 and L5-S1, and spurring in the lower thoracic spine at T11-T12. (Tr. 445).

Plaintiff saw orthopedist Christina Cheng, M.D., in January for her left hand pain; she also reported starting to develop similar pain in her right hand. (Tr. 521). The pain was worse with gripping, pinching, and grasping. *Id.* Plaintiff stated the previous injection from Dr. Malone provided only an hour of relief; she expressed interest in surgery. *Id.* On examination, Plaintiff had tenderness to palpation over her thumb CMC and STT joints, and a left volar wrist ganglion cyst. (Tr. 522). Dr. Cheng diagnosed bilateral thumb CMC and STT arthritis, noting Plaintiff had "[f]ailed nonoperative management on the left." (Tr. 523). She gave Plaintiff a thumb brace, NSAIDs for pain, and noted she would "schedule for surgery of trapezium resection tendon interposition and possible resection of ganglion cyst." *Id.*

Plaintiff underwent the surgery – a left-hand carpemetacarpal arthroplasty, ligament reconstruction, tendon transfer, and volar wrist ganglion cyst excision – later that month. (Tr. 513-16). At a May follow-up, Plaintiff reported persistent pain in the dorsal and volar aspect of her surgical site. (Tr. 507). Plaintiff reported using her splint "when she is out to prevent bumping it", but took it off at home and while sleeping; "[o]verall she state[d] that she is doing much more with her thumb", but was "concerned about the pain [and] asking about narcotic pain medications". (Tr. 508). On examination, Plaintiff was tender to palpation, but had full wrist range of motion through

passive flexion and extension, and 5-/5 resisted wrist flexion. *Id.* The physician instructed Plaintiff to discontinue splinting and attend outpatient therapy. *Id.*

Also in May 2016, Plaintiff began treatment for low back pain with Lakewood Pain Management and Chiropractic. (Tr. 329). She reported difficulty getting out of bed due to low back pain and stiffness. *Id.* On examination, she had restricted range of motion and spasm. *Id.* She underwent chiropractic treatment at four visits that month. (Tr. 348-49). A lumbar spine MRI showed disc herniations at L4-L5 and L5-S1. (Tr. 321-22).

In June, Plaintiff saw Peter Fragatos, M.D., at the Cleveland Spine and Pain Management Center regarding her low back pain, which she described as burning and achy, present for five years, and increased with walking and standing. (Tr. 336). She described the pain as present for years and worsening. *Id.* Dr. Fragatos observed Plaintiff was "sitting comfortably in chair on room entry". *Id.* On examination, Dr. Fragatos noted normal lower extremity coordination, muscle stretch reflexes, sensation, and strength; Plaintiff had no atrophy or tone abnormalities, and her straight leg raises were negative. (Tr. 337). She had a positive bilateral lumbar facet load and pain to palpation in her axial spine and bilateral lumbar paraspinal muscles. *Id.* Dr. Fragatos diagnosed lumbar spondylosis and instructed Plaintiff to return in one week for lumbar epidural injections. *Id.* Plaintiff underwent four injections in July and August 2016. (Tr. 338, 340-42). At a visit after the first injection, Plaintiff continued to report pain as well as numbness and weakness radiating down her right leg, but "[t]he lumbar spine pain ha[d] improved with the block." (Tr. 339). On examination she had a symmetric gait, "ok" coordination, tingling, tenderness, and spasms in her mid-low bilateral paraspinous muscles, diminished range of motion, and diminished strength in dorsiflexion. *Id.* A July 2016 lumbar spine x-ray showed disc space narrowing at L4-L5 and L5-S1 and no motion-induced subluxation. (Tr. 323).

Plaintiff continued to report pain to Dr. Fragatos, but noted her lumbar spine pain had improved 30% with the block. (Tr. 343). She continued to report numbness with weakness radiating down her right leg. *Id.* Dr. Fragatos's examination was the same as previously. *Compare* Tr. 343 *with* Tr. 339. He recommended another lumbar epidural block. (Tr. 343).

Plaintiff returned to Lakewood Pain Management and Chiropractic at the end of August 2016, reporting continued radiating lumbar spine pain. (Tr. 328). Examination revealed pain, spasm, and decreased range of motion. *Id.*; *see also* Tr. 347.

In September, Plaintiff returned to Ms. Foster-Geeter, reporting "extreme" aching, throbbing, low back pain radiating to her buttocks and posterior legs. (Tr. 365). Plaintiff reported that neither the spine clinic pain management or chiropractic treatment were helping and she was "[r]equesting Vicodin for pain". (Tr. 365). Ms. Foster-Geeter did not list any musculoskeletal findings on examination, but noted Plaintiff had a normal gait and her coordination was "intact as demonstrated by [her] ability to text." (Tr. 367). Ms. Foster-Geeter diagnosed, *inter alia*, "low back pain, unspecified back pain laterally, with sciatica presence unspecified"; she referred Plaintiff for a PM&R consultation. *Id.*

In October, Plaintiff saw Heather Rainey, M.D., at the MetroHealth PM&R Clinic for evaluation of her back pain. (Tr. 354-58). Plaintiff reported chiropractic treatment "helped somewhat" initially (Tr. 355), but was no longer working (Tr. 354). Plaintiff similarly reported that injections did not help. (Tr. 355). She took Vicodin, Tylenol 3, and that day, took a Percocet from her daughter. *Id.* She reported previous medications such as Mobic and Lyrica did not help; and she had side effects from Flexeril and Neurontin. *Id.* On examination, Dr. Rainey noted Plaintiff had tenderness to palpation in her lower lumbar spine, and left paraspinal muscles. *Id.* She had reduced range of motion in flexion and extension (Tr. 357), a positive FABER test, and

an antalgic gait (Tr. 358). She had negative straight leg raises (Tr. 358). Dr. Rainey diagnosed lumbar degenerative disc disease, lumbar facet arthropathy, chronic bilateral low back pain without sciatica, and lumbar stenosis. *Id.* She referred Plaintiff to physical therapy to address range of motion and core strengthening; she prescribed a TENS unit trial and ordered an EMG to evaluate for radiculopathy. *Id.* She further prescribed Percocet and "fill[ed] out disability paperwork". *Id.*

Plaintiff attended four physical therapy visits in October and November 2016. *See* Tr. 446-50, 454-56, 460-62, 466-68. At her first visit, Plaintiff reported she was able to drive independently and perform self-care and activities of daily living; she had "[d]ifficulty with tub transfers". (Tr. 447). She described constant pain that varied in intensity in her low back (but was 6/10 at this visit), radiating down both legs. *Id.* On examination, Plaintiff had minimal loss of range of motion in flexion and moderate loss in extension, but her sidebending was normal bilaterally. *Id.* She had some reduced muscle strength, absent lower extremity reflexes, intact sensation, and no tenderness to palpation. (Tr. 448). Her gait was "antalgic and slow"; her ability to go from sitting to standing and bed mobility were "labored [but] independent". (Tr. 449). Her Owestry back pain score indicated "severe disability". *Id.* The therapist noted Plaintiff had lumbar instability that improved with lumbar compressions and that she "should do well with a core program". *Id.* At subsequent visits, Plaintiff reported 4/10 pain twice (Tr. 454, 460), and 8.5/10 once (Tr. 466). She performed physical therapy exercises (Tr. 455, 461, 467), but continued to report pain (Tr. 456, 468).

In December 2016, Plaintiff underwent an internal medicine examination with Robin Benis, M.D. (Tr. 391-95). She reported a three-year history of chronic low back pain, worse with sitting and standing, worse on the left, and radiating down her left leg. (Tr. 391). Plaintiff also reported degenerative joint disease of her hands, citing her March 2015 surgery, as well as pain in the base of her right thumb. *Id.* Plaintiff cooked three days per week, and showered daily. (Tr.

392). She did not clean, do laundry, or shop "because she [could not] stand for too long." *Id.* Dr. Benis observed Plaintiff leaned forward as she walked and could not walk on her heels or toes without difficulty. *Id.* She was able to "squat partially 1/3rd of the way down", change for the examination without assistance, get on and off the examination table without assistance, and rise from a chair without difficulty. *Id.* Dr. Benis observed on a straight leg raising test, Plaintiff had "mild" low back pain lifting both legs to 45 degrees in a supine position and five degrees in the sitting position (more on the left than the right). (Tr. 393). She had mild warmth and swelling in her right knee, but her joints were stable and nontender (Tr. 393); she had normal knee flexion and extension (Tr. 396). Plaintiff had some reduced range of motion in her lumbar spine. (Tr. 398). On manual muscle testing, Dr. Benis observed Plaintiff's ability to grasp, manipulate, pinch, or perform fine coordination was normal bilaterally (Tr. 396) and Plaintiff had normal range of motion in her fingers and wrists (Tr. 398). She further noted Plaintiff had a "normal" ability to pick up a coin, key, write, hold a cup, open a jar, button/unbutton, zip, and open a door. (Tr. 397).

In January 2017, Plaintiff went to the emergency room for low back pain after she ran out of Percocet. (Tr. 495). She had full range of motion, a normal gait, and "minimal lumbar tenderness with distraction." (Tr. 497). In February, Ms. Foster-Geeter again noted Plaintiff had normal gait and "coordination intact as demonstrated by ability to text." (Tr. 479).

In March 2017, Plaintiff saw Travis Cleland, D.O., in the PM&R Clinic for right knee pain. (Tr. 547). She reported pain and intermittent swelling for two years. *Id.* She further reported frequent falls and that her knee occasionally "g[a]ve out on her". (Tr. 548). On examination, Dr. Cleland observed tenderness in Plaintiff's right knee on the medial and lateral joint lines, but no crepitus to flexion or extension; her range of motion was within functional limits and she had no ligamentous laxity. (Tr. 550). She had intact sensation in both bilateral lower extremities, and full

8

strength. *Id.* Several provocative tests to the right knee were negative. (Tr. 550-51). Dr. Cleland's plan was x-rays, a right knee brace, Diclofenac, no opiates, and physical therapy; he planned to try injections if this was ineffective. (Tr. 551).

Plaintiff returned to the emergency room in July 2017 for low back pain after a fall. (Tr. 492). On examination, she had tenderness in her lumbar paraspinous muscles, but normal strength in her legs, negative straight leg raising tests, and normal knee and ankle reflexes. *Id.*

At an appointment with Ms. Foster-Geeter in December 2017, Plaintiff had right knee fluctuance, swelling, and pain, and limited spinal range of motion. (Tr. 559). She had no paraspinal swelling or tenderness, a normal gait, and intact coordination. *Id.* Later that month, Plaintiff saw Melanie Malec, M.D., for chronic right knee pain and lower back pain. (Tr. 572). Plaintiff noted NSAIDs and muscle relaxants did not provide pain relief. *Id.* On examination, Dr. Malec noted Plaintiff had full range of motion in her right knee, with crepitus and mild effusion, but no erythema or swelling. (Tr. 575). She diagnosed right knee arthritis, gave Plaintiff a one-time Norco prescription, and performed a knee injection. *Id.*

In January 2018, Plaintiff went to the emergency room for chronic pain; discharge notes show she was prescribed Motrin and Robaxin. (Tr. 583-85).

*Opinion Evidence*

In September 2016, State agency physician Elaine Lewis, M.D., reviewed Plaintiff's records. (Tr. 71-75). She opined Plaintiff could perform light work with some postural restrictions, occasional pushing and pulling with the left upper extremity due to left thumb arthroplasty, and frequent pushing and pulling on the right due to carpal tunnel syndrome. (Tr. 74). She further opined Plaintiff was limited to occasional handling and fingering bilaterally due to carpal tunnel syndrome and degenerative arthritis. (Tr. 75)

9

After her October 5, 2016 examination, Dr. Rainey completed a physical residual functional capacity assessment. (Tr. 352-53). She opined Plaintiff could occasionally lift ten pounds, and frequently lift five. (Tr. 352). She could sit or stand/walk for two hours each in an eight-hour workday, but only thirty minutes without interruption. *Id.* Plaintiff could rarely[1] perform any postural activities, push/pull, or perform fine manipulation; she could occasionally[2] reach and perform gross manipulation. (Tr. 352-53). Dr. Rainey stated Plaintiff should avoid moving machinery and heights due to low back pain and lumbar degenerative disc disease. (Tr. 353). Finally, Dr. Rainey opined Plaintiff suffered from severe pain that would interfere with concentration, take her off task, and cause absenteeism; Plaintiff needed additional unscheduled rest periods. *Id.*

In November 2016, State agency physician David Knierim, M.D., reviewed Plaintiff's records. (Tr. 97-100). He affirmed Dr. Lewis's opinion, *id.*, repeating the statement that due to carpal tunnel syndrome and degenerative arthritis, Plaintiff was limited to occasional handling and fingering bilaterally (Tr. 99).

After her December 2016 examination, Dr. Benis opined that Plaintiff had "moderate" limitations in standing and walking long distances and going up and down stairs due to her herniated discs and sciatica; she further opined Plaintiff had "mild" limitations in her hands due to degenerative joint disease of her thumbs. (Tr. 394).

In November 2017, Ms. Foster-Geeter opined Plaintiff was unable to work due to "chronic low back pain that results in her inability to stand [or] sit for extended periods of time." (Tr. 582).

---

1. The form defined "rare" as "the activity cannot be performed for any appreciable period of time". (Tr. 352).
2. The form defined "occasional" as "from very little up to 1/3 of the workday". (Tr. 352).

VE Testimony

A VE testified at the hearing before the ALJ. (Tr. 56-66). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. *See* Tr. 58-60. The VE responded that such an individual could perform Plaintiff's past work as a packer (as she actually performed it)[3], as well as other jobs such as electrical accessories assembler, inspector/hand packager, or hammer mill operator. (Tr. 59-60). The VE further testified that if the individual were limited to occasional handling and fingering on the left, the individual could not perform Plaintiff's past work, but could still perform the alternative previously-identified three jobs. (Tr. 60-63).

ALJ Decision

In his July 17, 2018 decision, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through December 31, 2021, and had not engaged in substantial gainful activity since December 7, 2015. (Tr. 15). He concluded she had severe impairments of: disc herniation at L4-5 and L5-S1; degenerative arthritis of the left and right hands; post left excision volar wrist ganglion arising from scapho-trapezio-trapezoidal joint, carpometacarpal arthroplasty, ligament reconstruction with flexor carpi-radialis tendon, partial excision of trapezoid, and tendon transfer of extensor pollicis brevis to abductor pollicis longus; chronic pain/effusion of the right knee; essential hypertension; and obesity. *Id*. However, he found that none of these impairments – singly or in combination – met or medically equaled the severity of a listed impairment. (Tr. 16). The ALJ then concluded Plaintiff had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except [she] can frequently handle and finger with the left and the right. She can occasionally climb ramps and stairs. She can never climb ladders, ropes, or

---

3. The VE explained that Plaintiff's past work as a packer is generally performed at a medium exertional level, but Plaintiff actually performed it at a sedentary exertional level. (Tr. 57-58).

scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She can never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle.

(Tr. 16-17). The ALJ then determined Plaintiff was capable of performing her past relevant work as a packer (as generally performed, not as actually performed[4]). (Tr. 21). The ALJ alternatively determined that considering Plaintiff's age, education, work experience, and RFC, she could perform other jobs existing in significant numbers in the national economy such as electrical accessories assembler, inspector/hand packager, and hammer mill operator. (Tr. 22). Therefore, the ALJ found Plaintiff not disabled. (Tr. 23).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or

---

4. As the Commissioner notes, the ALJ appeared to have transposed "generally" and "actually". *See* Doc. 18, at 8 n.2. Plaintiff testified that she performed the job at a sedentary level, *see* Tr. 41-42, 57-58, and according to the VE, the job is a medium exertional job as generally performed. (Tr. 57-58) ("According to the *DOT*, it is physical demand of medium, and per the testimony the actual exertional level was sedentary."). The VE testimony upon which the ALJ relies reflects that he said a hypothetical individual with the restrictions set forth by the ALJ could perform her past work as a packer as she *actually* performed it, not as it is *generally* performed. *See* Tr. 58-59 ("That job [packer] could be performed as actually performed. It could not be performed as identified by the *DOT*.").

indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.*

13

Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff raises two related objections to the ALJ's decision. First, she contends the ALJ failed to provide the required good reasons for discounting the opinion of her treating physician – Dr. Rainey. Second, she contends the ALJ's RFC is not supported by substantial evidence because it does not accurately reflect Plaintiff's standing and walking, or manipulative limitations. For the reasons discussed below, the Court reverses and remands for further evaluation of Plaintiff's manipulative limitations.

<u>Dr. Rainey's Opinion</u>

Preliminarily, the parties dispute whether Dr. Rainey was a treating physician entitled to deferential treatment under the relevant law. Plaintiff argues Dr. Rainey's opinion was entitled to the deference afforded by the well-known "treating physician rule"; the Commissioner disputes this, arguing Dr. Rainey's single examination did not render the same-day opinion entitled to such deference. The Court agrees with the Commissioner.

Under the regulations, there exists a hierarchy of medical opinions: first is a treating source whose opinion is entitled to deference because it is based on an ongoing treatment relationship; second is a non-treating source, which are those medical sources who have examined but not treated the Plaintiff; and lastly is a non-examining source, those who render opinions based on a review of the medical record as a whole. 20 C.F.R. §§ 404.1502, 416.902. Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-

14

2p, 1996 WL 374188.[5] A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). These "good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin*., 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

For medical opinions from non-treating physicians, an ALJ is to consider the same factors. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) ("[W]e consider all of the following factors in deciding the weight we give to any medical opinion"). While "an opinion from a medical source who has examined a claimant is [generally] given more weight than that from a source who has

---

5. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819. Plaintiff filed her claim in 2016 and thus the previous regulations apply.

not performed an examination," ALJs have more discretion in considering non-treating source opinions. *Gayheart*, 710 F.3d at 375. An ALJ need not give "good reasons" for discounting non-treating source opinions. *See Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007). ALJs must only provide a meaningful explanation regarding the weight given to non-treating medical source opinions. *See* SSR 96-6p, 1996 WL 374180, at *2; *see also Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 520 (6th Cir. 2011) ("the ALJ's decision still must say enough to allow the appellate court to trace the path of his reasoning") (internal citation and quotation omitted).

A treating physician is "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you with medical treatment or evaluation and *who has, or has had, an ongoing treatment relationship with you.*" 20 C.F.R. §§ 404.1502, 416.902 (emphasis added). Opinions from such sources are entitled to deference "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone". 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). But "the rationale of the treating physician doctrine simply does not apply" where a physician issues an opinion after a single examination. *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994); *see also Atterberry v. Sec'y of Health & Human Servs.*, 871 F.2d 567, 572 (6th Cir. 1989) ("Dr. Zupnick is not a treating physician given the fact that he evaluated the claimant on only one occasion."); *Austin v. Comm'r of Soc. Sec.*, 714 F. App'x 569, 572 (6th Cir. 2018) ("Dr. Quiring examined Austin on only one occasion, and the rationale of the treating-physician doctrine simply does not apply here."); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506 (6th Cir. 2006) ("Kornecky

16

cites no authority where a federal court has found a source to be a treating source after only one visit. However, a plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship.").

Plaintiff contends that in the context of pain management and the facts of this case, Dr. Rainey was a treating physician. Specifically, she contends Dr. Rainey "is a pain management physician specializing in the evaluation and treatment of conditions causing chronic pain"; Dr. Rainey "performed a thorough examination of Ms. Dobson and provided her opinion based on that evaluation"; "[a]t the conclusion of this appointment, Ms. Dobson followed through with Dr. Rainey's recommendations and began physical therapy"; and "Dr. Rainey performed the fundamental and necessary tasks which a pain management physician would perform, taking into account the fact that Ms. Dobson had already undergone several types of injections, with little to no relief of her pain[.]" (Doc. 13, at 10-11). But Plaintiff does not point to any case law suggesting a single examination in the context of pain management is sufficient to confer treating physician status for purposes of Social Security regulations, nor was the Court able to find any. As stated above, the reason underlying the treating physician rule is that such a physician is "likely to be the medical professionals most able to provide *a detailed, longitudinal picture* of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone". 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An opinion rendered at the same time as a single examination simply does not fit this model even taking into account – as Plaintiff argues – that Plaintiff subsequently followed treatment recommendation from that physician. *See Kornecky*, 167 F. App'x at 506 ("But the relevant inquiry is not whether [the physician] might have become a treating physician in the future if Kornecky had visited him again. The question is whether [the physician] had the ongoing relationship with

Kornecky to qualify as a treating physician *at the time he rendered his opinion.*") (emphasis in original). The Court therefore finds that Dr. Rainey's opinion is not a "treating physician" opinion. As such, the ALJ was required to provide an explanation of the weight assigned, but not the heightened "good reasons." *See Martin*, 658 F. App'x at 259; *Smith*, 482 F.3d at 876; SSR 96-6p, 1996 WL 374180, at *2.

After summarizing Dr. Rainey's physical medical source statement and her October 5, 2016 examination, the ALJ explained his evaluation thereof:

> The undersigned gives little weight to Dr. Rainey's assessment because it is consistent with less than sedentary work activity. These extreme limitations are inconsistent with the claimant's conservative treatment and progress notes. Also, Dr. Rainey only initially examined the claimant and there is no established treating relationship.

(Tr. 20). Thus, aside from noting the lack of treatment relationship (a relevant factor under 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)), the ALJ's rationale for discounting Dr. Rainey's opinion was that it was inconsistent with Plaintiff's "conservative treatment and progress notes." (Tr. 20). This is an appropriate consideration. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.929(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). Over the prior two pages, the ALJ detailed Plaintiff's treatment, which consisted of physical therapy, medication (sometimes unprescribed), chiropractic treatment, and injections for her back, surgery for her left hand, and a knee injection. (Tr. 17-18). The ALJ also noted more recent relatively mild findings on examination, which supports his statement that Dr. Rainey's "extreme limitations" were inconsistent with Plaintiff's progress notes. *See* Tr. 18; *see also* Tr. 497 (January 2017 emergency room visit at which Plaintiff had full range of motion, normal gait, and "minimal lumbar tenderness with distraction"); Tr. 479 (February 2017 normal gait); Tr. 492 (July 2017 emergency room visit showing tenderness in the lumbar paraspinous

muscles, but "no tenderness over the spinous processes of the lumbar vertebrae, normal leg strength, negative bilateral straight leg raising, and normal and symmetrical reflexes); Tr. 559 (December 2017 – limited spinal range of motion, but no paraspinal swelling or tenderness and normal gait and coordination). The ALJ was not required to repeat this analysis in his evaluation of Dr. Rainey's opinion. *See, e.g.*, *Sprague v. Colvin*, 2015 WL 2066227, at *3 (S.D. Ohio) ("Where, as here, the ALJ thoroughly addressed such matters as the consultants' reports, the other medical evidence of record, and plaintiff's credibility earlier in his decision, the ALJ was not required to repeat his discussion of those matters again in his discussion of the weight to be assigned to the medical opinions."). Therefore, the Court finds no error as to the ALJ's consideration of Dr. Rainey's opinion as it relates to Plaintiff's ability to perform the general requirements of light work. However, as discussed below, the Court finds remand is required for the ALJ to properly address Plaintiff's manipulative restrictions, and thus does not address whether the ALJ properly evaluated Dr. Rainey's opinion thereon. The ALJ should consider and address Dr. Rainey's opinion regarding manipulative restrictions along with his further explanation thereof on remand.

<u>RFC</u>

Plaintiff further argues the ALJ's RFC is not supported by substantial evidence in two respects: first, the ALJ's failure to include – or explain the exclusion of – further manipulative limitations; and second, the ALJ's failure to include more restrictive standing and walking limitations. The Commissioner asserts any error with regard to manipulative limitations is harmless in light of the VE's testimony, and that substantial evidence supports the ALJ's finding that Plaintiff can perform the standing and walking requirements of light work. For the reasons

discussed below, the Court finds remand is necessary for further evaluation of Plaintiff's manipulative limitations.

*Manipulative Limitations*

The ALJ's RFC limited Plaintiff to *frequent* bilateral handling and fingering. (Tr. 16). By contrast, the State agency physicians, to whom the ALJ ascribed "great weight", both stated Plaintiff was limited to *occasional* handling and fingering bilaterally. *See* Tr. 75, 98 ("d/t CTS and deg arthritis, clmt is limited to occas handling and fingering LUE and RUE."). The ALJ's assessment of the State agency physician opinions did not acknowledge this finding:

> The State Agency medical examiners determined the claimant could do light work. She could never climb ladders, ropes, and scaffolds. She could frequently stoop, kneel, crouch, and crawl. She needed to avoid all exposure to hazards (machinery, heights, etc.).
>
> The undersigned gives their assessments great weight, but additional find[s] the claimant more limited based on the updated medical evidence and testimony. The State Agency medical examiners are familiar with the evaluation of disability according to SSA rules and regulations.

(Tr. 19). Although the Commissioner is correct that an ALJ may assign an opinion "great weight" without adopting all restrictions therein, *see, e.g.*, *Ellsworth v. Comm'r of Soc. Sec.*, 2016 WL 11260325, at *12 (N.D. Ohio) (collecting cases), Social Security rulings also require that "if the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted", SSR 96-8p, 1996 WL 374184, at *7. Based on the analysis presented by the ALJ, it is unclear whether he even recognized that the State agency physicians assessed any manipulative restrictions, much less restrictions that conflicted with the RFC. That is, it is unclear from his decision whether the ALJ rejected these restrictions or was simply unaware of them. More restrictive manipulative limitations were also supported by Dr. Rainey's opinion that Plaintiff could rarely perform fine manipulation and only occasionally perform gross

20

manipulation. (Tr. 353). The ALJ's decision does not grapple with this discrepancy between the opinion evidence and the RFC. As such, remand is required for a full evaluation of Plaintiff's manipulative abilities.

Further, the Court rejects the Commissioner's argument that any error in this regard is harmless "because the VE testified that, even if Plaintiff were limited to frequent handling and fingering with the right and occasional handling and fingering with the left, she could not perform her past work, but could still perform [the alternatively identified jobs]." (Doc. 18, at 13). This is a factually correct description of the VE's testimony, *see* Tr. 61-63, however, the VE was never asked a question in which the hypothetical individual was limited to occasional handling and feeling *bilaterally*, nor does the ALJ's decision distinguish between restrictions in Plaintiff's left and right hands. The State agency physicians (and Dr. Rainey) imposed equal bilateral handling and fingering restrictions, not just left-handed ones. Therefore, the Court cannot find the error harmless.

*Standing and Walking Limitations*

Plaintiff further argues the ALJ erred in finding she could perform the standing and walking requirements of light work. Light work requires a "good deal of walking or standing." 20 C.F.R. §§ 404.1567(b), 416.967(b)). Social Security Ruling 83-10 explains "that the full range of light work requires standing and/or walking, off and on, for a total of approximately 6 hours of an 8-hour workday" with intermittent sitting during the remaining time[.]" 1983 WL 31251, at *6. Plaintiff contends that "substantial evidence of record proves that the Plaintiff does not have the capacity to perform a good deal of standing and walking". (Doc. 13, at 14). She further contends that "[h]er examinations were consistently significant for tenderness, spasm, decreased range of motion, facet loading, diminished strength, decreased sensation, and antalgic gait[.]" *Id.* at 15

(citing Tr. 328, 343, 357-58. 392-93, 398). In further support, Plaintiff cites Dr. Rainey's opinion that Plaintiff could only stand and walk for two hours in an eight-hour workday and Dr. Benis's opinion that Plaintiff had "moderate limitations to standing and walking." *Id.* (citing Tr. 352, 394). Plaintiff notes that the ALJ "summarily ignored Dr. Benis' evaluation altogether". *Id.*

The Court finds no error in the ALJ's evaluation of Plaintiff's standing and walking restrictions. Although Plaintiff cites evidence of positive findings on examination, as discussed above in relation to Dr. Rainey's opinion, the ALJ cited substantial evidence to the contrary showing, e.g., observing normal gait, and milder examination findings. And it is for the ALJ, not this Court, to weigh the evidence in the first instance. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) ("This court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ."); *Jones*, 336 F.3d at 477 (even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ."). The ALJ's finding that Plaintiff could perform the standing and walking requirements of light work is further supported by the opinions of the State agency physicians, to which the ALJ assigned great weight. *See* Tr. 19, 74, 98.

Plaintiff is correct, however, that the ALJ failed to acknowledge Dr. Benis's opinion, *see* Tr. 17-21, though she presents no specific argument on this point. (Doc. 14, at 15). The regulations state an ALJ "will evaluate every opinion [he] receive[s]", 20 C.F.R. §§ 404.1527(c), 416.927(c), and the relevant ruling states "if the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted", SSR 96-8p, 1996 WL 374184, at *7. The Court, however, finds any such error in the ALJ's failure to mention Dr. Benis's

opinion is harmless. First, Plaintiff has not shown – and indeed it is unclear – whether Dr. Benis's finding that Plaintiff had "moderate" limitations in standing and walking long distances is inconsistent with a finding that she can perform light work. Indeed, some courts have found that "moderate" standing and walking limitations are not inherently inconsistent with light work. *Hernandez v. Colvin*, 2015 WL 790756, at \*5 (W.D.N.Y); *Bass v. Colvin*, 2014 WL 2616190, at \*6 (W.D. Ark.). Second, the other restrictions included in Dr. Benis's opinion were accommodated by the RFC. *Compare* Tr. 16 (RFC limitations to frequent handling and fingering, and occasional climbing of ramps and stairs), *with* Tr. 394 (Dr. Benis's opinion that Plaintiff would have "moderate limitations . . . going up and down stairs" and "mild limitations to using her hands"). Third, and finally, as the Commissioner points out, the ALJ's ultimate conclusion was that Plaintiff could perform her past relevant work as a packer, which she performed at a sedentary exertional level. *See* Tr. 21.[6] There is certainly no conflict between Dr. Benis's opinion and work performed at a sedentary level.[7] As such, the Court finds no error.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying DIB and SSI not supported by substantial evidence and reverses and remands that decision pursuant to Sentence Four of 42 U.S.C. § 405(g) as detailed above.

 s/ James R. Knepp II
United States Magistrate Judge

---

6. Again, the Court notes the ALJ's transposition of the words "generally" and "actually". *See* Tr. 21, 57-59.
7. Although the Court here finds the error in failing to consider Dr. Benis's opinion harmless in the current context, should the ALJ determine on remand that Plaintiff could not perform her prior work, this third reason would not apply. In that case, and because remand is already required, the ALJ should ensure that any subsequent decision contains a discussion of Dr. Benis's opinion.